IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

_____

UNITED STATES          )
           )
           )
           )     Case No. ELH-18-CR-072
v.                  )
           )
           )
MARVIN WISE,          )
           )
Defendant.         )
_____ )

## MOTION FOR ORDER GRANTING COMPASSIONATE RELEASE AND MODIFYING SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Marvin Wise, through undersigned counsel, respectfully moves this Honorable Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on "extraordinary and compelling reasons" presented by the COVID-19 pandemic. Mr. Wise, who is almost 60, has a combination of underlying serious health conditions—including **diabetes, heart disease, kidney disease, and asthma**—that make him exceptionally vulnerable to COVID-19. Mr. Wise has virtually all of the most serious COVID-19 risk factors identified by medical authorities. He falls into every group urged to take the maximum precautions against contracting the coronavirus. It is not safe for Mr. Wise to remain in prison, where he is unable to isolate himself or maintain a controlled, sanitary environment. In addition, Mr. Wise was **erroneously sentenced as a career offender**, despite the fact that he clearly is not one, under controlling Fourth Circuit precedent. As a result, he likely is serving a longer sentence than is appropriate under § 3553(a). For both of these reasons, we

1

ask the Court to issue an order modifying Mr. Wise's sentence to reduce his term of incarceration to time served and to require him to serve an additional period of time on home confinement.

## STATEMENT OF FACTS

Marvin Wise pled guilty on April 29, 2019, to one count of Conspiracy to Distribute Heroin, in violation of 21 U.S.C. § 846.  He pled guilty pursuant to a written plea agreement that stipulated that he was a career offender.  Dkt. No. 137.  Mr. Wise admitted to playing a relatively small role in a nonviolent drug conspiracy.  On July 23, 2019, this Court sentenced Mr. Wise to 72 months of imprisonment, followed by three years of supervised release.  Dkt. No. 156 (Judgment).

Mr. Wise is currently serving his sentence at Allenwood Low FCI (a low-security prison) in Allenwood, Pennsylvania.  His projected release date, according to the Bureau of Prisons, is just over four years away: June 22, 2024.  The Court recommended that the Bureau of Prisons (BOP) designate Mr. Wise to serve his sentence at FCI Butner, which houses the closest Federal Medical Center to Baltimore, but BOP did not do so.

Mr. Wise, who will turn 60 in July, suffers from an array of serious chronic medical conditions, including diabetes, heart disease, hypertension, kidney disease, asthma, and arthritis.  While on pretrial release in this case, Mr. Wise was diagnosed with kidney cancer.  As a result, he underwent surgical removal of one kidney.  Mr. Wise has also suffered three heart attacks, including one after sentencing in 2019, while in transit to BOP.  He requires a host of medications and specialized treatment to manage his numerous medical conditions.

Mr. Wise filed a pro se motion asking this Court for compassionate release based on his medical conditions. His motion, dated March 27, 2020, was docketed on March 30, 2020. Dkt. No. 165. Shortly thereafter, Mr. Wise filed an administrative request for compassionate release with the institution where he is incarcerated. The Warden denied Mr. Wise's request for compassionate release on April 15, 2020.[1] Thus, Mr. Wise has satisfactorily pursued his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).

**LEGAL BACKGROUND**

**A. Compassionate Release Before the First Step Act**

On December 21, 2018, the President signed into law the First Step Act, which, among other things, made significant changes to the statute governing compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983). "This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on any individual no longer served legislative objectives." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at * 5 (S.D.N.Y. Apr. 6, 2020).

---

[1] A copy of the Warden's denial letter is attached as Exhibit A.

The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Congress delegated to the U.S. Sentencing Commission ("Commission") the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). However, it was not until 2007, more than two decades after the statute was enacted, that the Commission responded. It issued a guideline stating that "extraordinary and compelling reasons" include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, comm. n.1(A).

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the Bureau of Prisons. During the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria.  The Office of the Inspector General for the Department of Justice concluded in 2013 that "[t]he BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."[2]

---

[2] Dep't of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (April 2013), at 11, available at https://oig.justice.gov/reports/2013/ e1306.pdf.  *See also* Dep't of Justice, Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (May 2015), at 51, available at https://oig.justice.gov/ reports/2015/e1505.pdf#page=1 ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates

### B. Compassionate Release After the First Step Act

Through the First Step Act, Congress sought to resuscitate compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). The compassionate release statute, as amended by the First Step Act, authorizes courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and applicable policy statements issued by the Commission—regardless of the BOP's position. Thus, courts no longer need to await a motion by the BOP to consider a defendant for compassionate release. "[U]nder the amended statute, a court may conduct such a review also 'upon motion of the defendant,' if the defendant has exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has lapsed 'from the receipt of such a request by the warden of the defendant's facility,' whichever is earlier." *United States v. Decator*, Crim. No. CCB-95-0202, 2020 WL 1676219 (D. Md. Apr. 6, 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)(i); Pub. L. 115-391, Title VI, § 603(b), Dec. 21, 2018, 132 Stat. 5239).

Considering the First Step Act's objective to increase courts' flexibility to grant compassionate release and minimize the BOP's role in the process, courts are no longer constrained by the BOP's determination of when relief is warranted. This is because those portions of the Commission's policy statement delegating to the BOP Director the power to decide what are "extraordinary and compelling reasons" are in

have been released under it."); U.S.S.G. § 1B1.13, n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates).

conflict with the amended statute. *See, e.g.*, *United States v. Cantu*, 2019 WL 2498923, at *3-4 (S.D. Tex. June 17, 2019) (vesting BOP with authority to determine whether extraordinary and compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court"); *United States v. Ebbers*, 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts.  Deferring to the BOP would seem to frustrate that purpose.").

Indeed, the BOP's unduly narrow view of eligibility for compassionate release is reflected in the Warden's letter denying Mr. Wise's request for compassionate release here (attached as Exhibit A).  The denial letter applies rigid criteria that are in conflict with the broad and flexible statutory directive of "extraordinary and compelling circumstances."  18 U.S.C. § 3582(c)(1)(A).

Now that power lies where Congress intended: in the courts. And, in the fifteen-month span since the First Step Act took effect, courts have significantly expanded the scope of compassionate release, finding "extraordinary and compelling reasons" in circumstances wholly apart from, or in combination with, the limited factors on which the BOP narrowly relied (age, medical condition, and family needs):

- *United States v. Decator*, No. CCB-95-0202, 2020 WL 1676219 (D. Md. Apr. 6, 2020) ("While Sentencing Commission and BOP criteria remain helpful guidance, the amended § 3582(c)(1)(A)(i) vests courts with independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence. . . . Accordingly, pursuant to its independent discretion, the court finds that Decatur's continued incarceration under a sentencing scheme that has since been substantially amended is a permissible

'extraordinary and compelling' reason to consider him for compassionate release.")

- *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *15 (S.D.N.Y. Apr. 6, 2020) ("Mr. Millan's extraordinary rehabilitation, together with his remorse and contrition, his conduct as model prisoner and man of extraordinary character, his leadership in the religious community at FCI Fairton, this dedication to work with at-risk youth and suicide prevent, and the support of BOP staff at FCI Fairton, including their opinion that if release, Mr. Millan would be a productive member of society and no danger to others, and the sentencing disparity that would result from further incarceration all constitute extraordinary and compelling reasons justifying a reduction in sentence.")

- *United States v. Owens*, No. 97-CR-2546-CAB, ECF No. 93 at 4 (S.D. Cal. Mar. 20, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence — and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D), that is, 'an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' relating to prisoner health or family relations." (citation and internal quotation marks omitted));

- *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . .");

- *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kansas Mar. 11, 2020) ("Since the passage of the First Step Act, however, a majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it. . . . The United States agrees that this is the majority view. . . . As a majority of district courts have concluded, this court concludes that it has the authority to exercise the same discretion as the BOP when weighing a request for compassionate relief." (internal citations and quotations marks omitted));

- *United States v. Young*, No. 2:00-cr-0002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("Notwithstanding the statutory amendment, . . . the 'catch-all' provision in Application Note (1)(D) to U.S.S.G. § 1B1.13 still cross-references the BOP Director as the individual with authority to determine in a particular prisoner's case the existence of another 'extraordinary and compelling reason, other than, or in combination with, the reasons described in subdivisions (A) through (C).'  . . .  As both parties recognize, however, the dependence on the BOP to determine the existence of an extraordinary and compelling reason . . . is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act.  Although it does not appear that any federal circuit court of appeals has addressed this issue, a majority of the district courts that have considered the issue have likewise held, based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons.");

- *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kansas Feb. 21, 2020) (agreeing with "numerous courts" that have "recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence — and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D), that is, 'an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' relating to prisoner health or family relations");

- *United States v. Maumau*, No. 2:08-cr-0758-TC, 2020 WL 806121, at *3 (D. Utah Feb. 18, 2020) ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement." (citation and internal quotation marks omitted));

- *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8. 2020) ("agree[ing] with those courts" that have concluded that "Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant");

- *United States v. Valdez*, No. 3:98-cr-0133-01-HRH, 2019 WL 7373023, at *2 (D. Alaska Dec. 31, 2019) ("This court concludes that it is no longer bound to look to the director of the Bureau of Prisons for a definition of extraordinary and compelling reasons beyond application note 1(A) through (C)");

8

- *United States v. Rodriguez*, No. 17-cr-00021-WHO-1, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) ("This court follows the growing number of district courts that have concluded that, in the absence of applicable policy statements, courts 'can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. 1B1.13 cmt. N.1 (A)-(C) warrant compassionate release.'");

- *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) ("[T]his Court may use Application Note 1(D) as a basis for finding extraordinary and compelling reasons to reduce a sentence.");

- *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, at *2 (N.D. Ohio Oct. 17, 2019) ("However, under subsection (D) of the note, the Court may also consider other 'extraordinary and compelling reasons' not specifically articulated.");

- *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019) ("[I]f the FSA is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.");

- *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6, 8-9 (M.D.N.C. June 28, 2019) ("[C]ourts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.");

- *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Application Note 1 (D), as currently written, provides that such combination of circumstances will be '[a]s determined by the Director of the Bureau of Prisons.'  However, the current policy statement predates the enactment of the First Step Act and is not likely to be amended within the foreseeable future due to lack of a sufficient number of serving members of the Sentencing Commission.  Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted)); and

- *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) ("[T]he correct interpretation of § 3582(c)(1)(A)—based on the text, statutory history and structure,

and consideration of Congress's ability to override any of the Commission's policy statements 'at any time'—is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief." (internal citation omitted)).

As these cases illustrate, now that courts are no longer constrained by the BOP's narrow interpretation of "extraordinary and compelling reasons," they have embraced their broad discretion under § 3582(c)(1)(A) to grant compassionate release.

## ARGUMENT

### A. The COVID-19 Pandemic, Which Poses Particular Dangers to Older and Medically Vulnerable Inmates, Presents "Extraordinary and Compelling Reasons" for Compassionate Release.

On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[3] On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 et seq.[4] Several days later, the White House issued guidance recommending that gatherings of ten or more persons be canceled or postponed.[5]

---

[3] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020), available at https://bit.ly/2W8dwpS.

[4] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclemation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[5] Sheri Fink, White House Takes New Line After Dire Report on Death Toll, New York Times (March 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module=Spotlight&pgtype=Homepage.

In the weeks since these pronouncements, COVID-19 has continued to spread at an alarming rate. As of April 21, 2020, nearly 2.5 million people have been infected globally and more than 171,000 people have died. In the United States, nearly 800,000 people have been infected and nearly 43,000 people have died.[6] (The numbers, which increase sharply each day, almost certainly underrepresent the true scope of the crisis in the U.S. considering the widespread unavailability of test kits to detect the virus.) To stem the spread of the disease, the CDC has broadly advised people to take basic preventive actions, such as avoiding crowds, staying 6 feet away from others, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer.[7]

At the same time, public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[8] Indeed, the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[9] Prior to March 13, 2020, when the BOP suspended visits for 30 days, inmates regularly engaged in

---

[6] COVID-19 Coronavirus Pandemic, available at https://www.worldometers.info/coronavirusupdates.

[7] *Id.*

[8] "Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at https://bit.ly/2W9V6oS.

[9] Joseph A. Bick, Infection Control in Jails and Prisons, Clinical Infectious Diseases 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910; Vice, Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits (Mar. 24, 2020), available at https://www.vice.com/ en_us/ article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

social, legal and medical visits with people in the community at a time when the novel coronavirus already began to spread.[10] Currently, inmates must still share communal living spaces, such as cells, recreation rooms, dining halls, libraries, and exercise yards. To make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol content.[11]

Recognizing the unique risks that correctional facilities pose to inmates and employees, members of Congress asked the BOP on March 19, 2020, to allow for the immediate release of elderly, non-violent inmates.[12] The next week, Attorney General Barr urged the BOP to prioritize home confinement for such vulnerable individuals.[13] On March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable

---

[10]   Federal   Bureau   of   Prisons   Covid-19   Action   Plan,   available   at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[11] Keri Blakinger and Beth Schwarzapfel, How Can Prisons Contain Coronavirus When Purell is Contraband?, ABA Journal (March 13, 2020), available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[12] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

[13]      https://www.themarshallproject.org/documents/6820452-Memorandum-from-Attorney-General-to-BOP-re-Home.

inmates who have already served a majority of their sentence.[14] The same day, dozens of public health experts made a similar request, asking the President to commute the sentences of elderly inmates, noting they are at the highest risk of dying from the disease and pose the smallest risks to public safety.[15] On April 3, 2020, pursuant to his authority under the CARES Act, Attorney General Barr directed the BOP to expand the use of home confinement upon finding that "emergency conditions are materially affecting the functioning of the Bureau of Prisons."[16]

COVID-19 is now spreading rapidly within the Bureau of Prisons.  According to BOP's most recent published data, 497 inmates and 319 staff have tested positive for COVID-19.  Twenty-two inmates have died.  The disease has spread to at least 45 of the BOP's prisons and 14 residential reentry centers (RRCs).[17]  It is widely believed that BOP's published data significantly underreports the total number of cases with its prisons, because of lack of testing and other factors.[18]

As the following illustrations demonstrate, despite the BOP's best efforts to take precautionary measures, it has been woefully unprepared to contain the virus's

---

[14]   https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf.

[15]   https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf.

[16] https://www.justice.gov/file/1266661/download.

[17] https://www.bop.gov/coronavirus/ (last viewed April 21, 2020).

[18] *See, e.g.*, Walter Pavlo, Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison, Forbes (April 1, 2020), at https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#e1b020d7ba32.

spread. Indeed, the number of COVID-19 infections within the BOP has increased precipitously over the past several weeks:

### Increase in Infections Among BOP Inmates & Staff Since March 20, 2020[19]

| Date | Number of BOP Cases | BOP Percentage Increase Since 03/20/20 | National Percentage Increase Since 03/20/20 | Number of National Cases |
|---|---|---|---|---|
| 3/20/20 | 2 | 0% | 0% | 18,747 |
| 3/21/20 | 3 | 50% | 31% | 24,583 |
| 3/23/20 | 6 | 200% | 135% | 44,183 |
| 3/24/20 | 9 | 350% | 190% | 54,453 |
| 3/26/20 | 18 | 800% | 355% | 85,356 |
| 3/27/20 | 27 | 1250% | 451% | 103,321 |
| 3/29/20 | 38 | 1800% | 651% | 140,904 |
| 3/30/20 | 52 | 2500% | 772% | 163,539 |
| 3/31/20 | 59 | 2850% | 892% | 186,101 |
| 4/1/20 | 94 | 4600% | 1036% | 213,144 |
| 4/2/20 | 114 | 5600% | 1176% | 239,279 |
| 4/3/20 | 141 | 6950% | 1379% | 277,205 |
| 4/4/20 | 174 | 8600% | 1526% | 304,826 |
| 4/5/20 | 197 | 9750% | 1665% | 330,891 |
| 4/6/20 | 259 | 12850% | 1897% | 374,329 |
| 4/7/20 | 313 | 15550% | 1963% | 386,800 |
| 4/8/20 | 377 | 18750% | 2140% | 419,975 |
| 4/9/20 | 408 | 20300% | 2349% | 459,165 |
| 4/10/20 | 481 | 23950% | 2527% | 492,416 |
| 4/11/20 | 520 | 25900% | 2704% | 525,704 |
| 4/12/20 | 541 | 26950% | 2860% | 554,849 |
| 4/13/20 | 589 | 29350% | 2954% | 572,587 |

---

[19] See www.cdc.gov and https://coronavirus.jhu.edu/map.html.



Amid this rapidly unfolding crisis, the universally recommended antidote is to reduce the prison population by releasing those whose continued incarceration is not necessary to protect the public, so that correctional institutions can better protect those who need to stay incarcerated. And courts have begun to heed that call, ordering the release of old and vulnerable inmates where the BOP has been unwilling or unable to act with the required urgency.

For example, twice this Court has mentioned the threat of COVID-19 in granting a motion filed under Section 404 of the First Step Act and reducing the defendant's sentence to time served. In *United States v. Collins*, Crim. No. 10-CCB-0336, ECF 1038 (Mar. 30, 2020), this Court explained:

> Finally, the court must acknowledge the extraordinary circumstances present in the community as a result of the COVID-19 pandemic. It is well established by public health authorities that efforts should be made to permit social distancing and minimize the risks of transmission through close contact. While it has not been proffered that Collins has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release when weighed against all the factors the court must consider, here we have, as described above, a non-violent drug offender who has already served a lengthy sentence and has been determined ready for community placement at the VOA. Collins has a home ready to receive him, where he can be placed on home confinement. While traditional location monitoring (an ankle bracelet) is not currently available, other methods of monitoring may be implemented in the discretion of the Probation Office.

*See also United States v. Glover*, Crim. No. JKB-08-0382, ECF No. 279 (D. Md. Apr. 13, 2020) ("The Court's attention is particularly focused by the circumstance of the COVID-19 virus being present in federal Bureau of Prisons ('BOP') facilities, which makes consideration of the defendant's request urgent. Therefore, if release is going to occur, it should be done swiftly to account for this emergency.")

Courts nationwide recognize that, at least for some incarcerated persons, COVID-19 represents "extraordinary and compelling reasons" warranting a reduction in sentence under the compassionate release statute. A non-exhaustive list includes:

16

- *United States v. Hammond*, No. 1:02-cr-294-BAH, ECF No. 51 (D.D.C. Apr. 16, 2020) (granting compassionate release to defendant with age and health risk factors because, despite the government's assurance that "BOP is prepared to deal with pandemics such as the coronavirus . . . 449 inmates and 280 BOP staff members have tested positive for the disease and sixteen inmates have already died");

- *United States v. Tran*, Crim. No. 08-0197-DOC, ECF No. 402 (C.D. Calif. Apr. 10, 2020) (finding defendant's asthma given the outbreak at FCI Oakdale "presents an extraordinary and compelling reason for compassionate release");

- *United States v. Burrill*, No. 17-cr-0491-RS-1, ECF No. 308 (N.D. Calif. Apr. 10, 2020) (granting compassionate release because defendant, 75, "suffers from asthma, high blood pressure, high cholesterol, diabetes, diverticulosis, blood clots, hearing loss, glaucoma, cataracts, and lower back nerve pain," placing him at a "heightened risk of becoming severely ill from COVID-19");

- *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 10, 2020) ("Mr. Rodriguez's circumstances—particularly the outbreak of COVID-19 and his underlying medical conditions that place him at a high risk should he contract the disease—present 'extraordinary and compelling reasons' to reduce his sentence.");

- *United States v. Miller*, No. 16-cr-20222-1, 2020 WL 1814084, at *4 (E.D. Mich. Apr. 9, 2020) ("Miller squarely fits the definition of an individual who has a higher risk of falling severely ill from COVID-19. . . . Therefore, the Court finds that extraordinary and compelling reasons exist for his immediate compassionate release.");

- *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) ("The Court also finds that Zukerman has set forth 'extraordinary and compelling reasons' to modify his sentence, 18 U.S.C. § 3582(c)(1)(A)(i), because of the great risk that COVID-19 poses to an elderly person with underlying health problems.");

- *United States v. Colvin*, No. 3:19-cr-179 (JBA), 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (citing COVID-19 and defendant's medical conditions and "conclud[ing] that Defendant has demonstrated extraordinary and compelling reasons justifying her immediate release");

- *United States v. Edwards*, No. 6:17-cr-00003, 2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020) (concluding defendant "has demonstrated an extraordinary and compelling reason for his compassionate release" in light of COVID-19 and preexisting health conditions);

17

- *United States v. Perez*, No. 17-cr-0513-AT, ECF No. 98 (S.D.N.Y. Apr. 1, 2020) (finding defendant's pre-existing medical condition combined with the risk of contracting COVID-19 at MDC Brooklyn constitutes "extraordinary and compelling reasons" to reduce his sentence to time served);

- *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (granting compassionate release because COVID-19 and defendant's medical conditions constitute "extraordinary and compelling reasons");

- *United States v. Muniz*, No. 4:09-CR-0199-1, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) ("Because Defendant is at high-risk for severe illness from COVID-19 and because inmates in detention facilities are particularly vulnerable to infection, the Court finds that Defendant has demonstrated an extraordinary and compelling reason for compassionate release.");

- *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (finding "extraordinary and compelling reasons" based on combination of "COVID-19 pandemic" and defendant's "medical conditions");

- *United States v. Hansen*, No. 07-CR-00520(KAM), 2020 WL 1703672, at *8-9 (E.D.N.Y. Apr. 8, 2020) (granting compassionate release in light of "the unique risks posed by the COVID-19 pandemic to prisoners like Mr. Hansen, who is elderly and infirm").

As these cases demonstrate, courts around the country recognize that for individuals who face the greatest risk of falling gravely ill from COVID-19 (those who are elderly or have an underlying illness), the outbreak represents an "extraordinary and compelling reason" that justifies compassionate release. Because Mr. Wise clearly falls into both categories of vulnerability – he is almost 60 years old *and* he suffers from heart disease and diabetes, among other serious medical conditions – compassionate release is warranted here.

## B. The § 3553(a) Sentencing Factors Warrant Reducing Mr. Wise's Sentence to Time Served and Imposing an Additional Term of Home Confinement.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must

consider the relevant sentencing factors of 18 U.S.C. §3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, Mr. Wise's extreme vulnerability to a COVID-19 as a result of his age and serious medical conditions, when combined with the other Section 3553(a) sentencing factors, is grounds for relief. In addition, the fact that Mr. Wise was erroneously sentenced as a career offender provides further support for relief.

1. Mr. Wise's Medical Conditions Render Him Especially Vulnerable to COVID-19.

Mr. Wise suffers from a number of serious medical conditions that are difficult to manage within the Bureau of Prisons even under the best of circumstances. These conditions make Mr. Wise exceptionally vulnerable to COVID-19.

Mr. Wise suffers from heart disease (both coronary artery disease and hypertension), Type 2 diabetes, chronic kidney disease, asthma, arthritis, and gout.[20] Mr. Wise has been treated recently for multiple acute medical conditions. In October 2018, while on pretrial release, Mr. Wise underwent surgery to remove one of his kidneys, where a cancerous tumor was located. He was hospitalized for six days. Mr. Wise has also suffered three heart attacks, including one in October 2019, while in transit to the Bureau of Prisons after sentencing.[21] The Court recommended that

---

[20] Gout is a form of inflammatory arthritis that is very painful. It usually occurs in one joint at a time, often in the big toe. It is caused by hyperuricemia, the buildup of excess uric acid in the body. Poor kidney function and diabetes are both associated with the development of hyperuricemia. *See* Centers for Disease Control and Prevention, Gout, available at https://www.cdc.gov/arthritis/basics/gout.html.

[21] *See* PSR ¶ 68; Records from Kaiser Permanente (March 18, 2019); Records from the Bureau of Prisons (provided April 17, 2020). BOP records reflect the following current diagnoses for Mr. Wise, as of November 2019:

- Asthma

BOP designate Mr. Wise to a Federal Medical Center, but BOP did not follow the Court's recommendation and sent him to FCI Allenwood Low.

Mr. Wise uses an inhaler for his asthma and requires a host of other daily medications to control and treat his other conditions.[22]  He requires specialized care in nephrology and cardiology.  He needs blood work every two months, to monitor his kidney function and uric acid levels.  He needs chest x-rays every six months to assess his heart and lung function.  He needs CT scans every six months to check for cancer, due to his recent history of kidney cancer.  BOP medical records reflect that he is designated to be seen in numerous chronic care clinics, including: cardiac, diabetic, nephrology, hypertension, orthopedic/rheumatology, pulmonary/respiratory, and endocrine/lipid.

---

- Atherosclerosis [hardening of the arteries, the cause of coronary artery disease]
- Chronic kidney disease, stage 3 (moderate)
- Essential (primary) hypertension
- Gout, unspecified
- Hyperlipidemia, unspecified [high blood cholesterol]
- Type 2 diabetes mellitus
- Unspecified osteoarthritis, unspecified site.

These records are voluminous and therefore not included with this filing; however, they can be provided to the Court under separate cover if the Court would like to see them.

[22] BOP records reflect that Mr. Wise is currently prescribed the following medications:

- Albuterol inhaler (asthma)
- Allopurinol (gout)
- Amitriptyline (gout, arthritis)
- Aspirin (diabetes, hypertension, hyperlipidemia)
- Atorvastatin (hyperlipidemia)
- Carvedilol (hypertension, heart failure)
- Colchicine (gout)
- Losartan potassium (hypertension, kidney disease).

Mr. Wise has a strong family history of heart disease and other serious medical conditions resulting in early death and other bad outcomes.  Mr. Wise's father died of a heart attack or stroke at age 54.  PSR ¶ 60.  One of Mr. Wise's brothers died of lung cancer at age 51.  PSR ¶ 61.  Another of Mr. Wise's brothers (a paternal half-brother) suffered a severe stroke in his late 40s and is now wheelchair-bound.  PSR ¶ 63.

Mr. Wise's existing medical conditions make him especially vulnerable both to developing COVID-19 and to suffering severe symptoms or death from the virus.

**The combination of heart disease and diabetes, in older adults, is especially dangerous**.  A recently published study in the peer-reviewed medical journal JAMA Cardiology found  "*an exponential increase in disease severity and mortality in those beyond the sixth decade of life with cardiovascular disease (CVD) and diabetes.*"[23] The CDC has similarly identified heart disease and diabetes, among other chronic illnesses, as conditions that place individuals at "high risk for severe illness from COVID-19."[24]  The American Heart Association (AHA) is "advising caution and preparation for people who have heart disease or who have survived a stroke.  Based

---

[23] AlGhatrif et al., The Dilemma of Coronavirus Disease 2019, Aging, and Cardiovascular Disease, JAMA Cardiology (April 3, 2020) (emphasis added), available at https://jamanetwork.com/journals/jamacardiology/fullarticle/2764300.

[24] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html; *see also* CDC, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020 (April 3, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm (finding based on preliminary data that "persons with underlying health conditions such as diabetes mellitus, chronic lung disease, and cardiovascular disease, appear to be at higher risk for severe COVID-19–associated disease than persons without these conditions" and emphasizing the importance of protecting those individuals from exposure through social distancing and other strategies).

on current information, it appears elderly people with coronary heart disease or hypertension are more likely to be infected and to develop more severe symptoms."[25] The American Diabetes Association has likewise warned that people with diabetes face "a higher chance of experiencing serious complications from COVID-19."[26] Moreover, "[h]aving heart disease or other complications in addition to diabetes could worsen the chance of getting seriously ill from COVID-19 … because your body's ability to fight off an infection is compromised."[27]

**Chronic kidney disease is another serious risk factor.**  The National Kidney Foundation has warned that "[p]eople with kidney disease … are at higher risk for developing serious complications from COVID-19."[28]  A recent medical study of patients in Wuhan, China found a high prevalence of kidney disease on admission among patients hospitalized with COVID-19.  The study further found that kidney disease was associated with in-hospital mortality among COVID-19 patients.[29]

---

[25] *See* American Heart Association, Coronavirus (COVID-19) Resources, https://www.heart.org/en/coronavirus/coronavirus-covid-19-resources; *see also, e.g.*, The Harvard Gazette, Coronavirus and the Heart (April 14, 2020), at https://news.harvard.edu/gazette/story/2020/04/covid-19s-consequences-for-the-heart (explaining that "people with preexisting heart disease are at a greater risk for severe cardiovascular and respiratory complications from COVID-19").

[26] *See* https://www.diabetes.org/covid-19-faq.

[27] *Id.*

[28] *See* https://www.kidney.org/covid-19.

[29] Yichuan Cheng et al., Kidney Disease Is Associated with in-Hospital Death of Patients with COVID-19, Kidney International Journal of the International Society of Nephrology (March 5, 2020), available at https://www.kidney-international.org/article/S0085-2538(20)30255-6/fulltext.

**Asthma adds yet another risk factor.**  The CDC has warned that "[p]eople with moderate to severe asthma may be at higher risk of getting very sick from COVID-19," which "can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[30]  Mr. Wise's asthma, together with his multiple other serious chronic conditions, place him at an extremely high risk of becoming seriously ill from COVID-19.  It is vital to his health that he take every precaution against contracting the coronavirus.

At least two staff members at BOP's Allenwood facilities have already tested positive for COVID-19 (one at Allenwood Medium FCI and one at USP Allenwood) according to information released by BOP.  *See* https://www.bop.gov/coronavirus.  The outbreak of COVID-19 within the Bureau of Prisons, where Mr. Wise does not have the ability to appropriately isolate and protect himself, seriously endangers Mr. Wise's already fragile health.  Under these circumstances, compassionate release is warranted.

2.  Mr. Wise Was Erroneously Sentenced as a Career Offender.

Compassionate release is warranted for the separate reason that Mr. Wise was incorrectly treated as a career offender at sentencing, resulting in an erroneous more-than-doubling of the applicable guidelines range in his case.

Mr. Wise's plea agreement incorrectly stipulated that he was a career offender. Dkt. No. 137, at 5 (¶ 7b).  The PSR also incorrectly concluded that he was a career offender based on prior convictions for attempted distribution of CDS.  PSR ¶ 41.

---

[30]  *See*  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma. html.

Accordingly, Mr. Wise was treated as a career offender at sentencing. Under the career offender guidelines, Mr. Wise's final offense level was 29 and his criminal history category was VI, resulting in an advisory guidelines range of **151–188 months**. Stripping away the career offender enhancement, Mr. Wise's total offense level is 21 and his criminal history category is V, resulting in an actual guidelines range of **70–87 months**. The erroneous application of the career offender guideline resulted in an eight-level increase in Mr. Wise's total offense level plus an increase of one criminal history category. The effect of these erroneously applied enhancements was to more than double the applicable guidelines range.

Mr. Wise is plainly not a career offender because the offense of conviction in this case—conspiracy to distribute a controlled substance under 21 U.S.C. § 846—is not a "controlled substance offense" for purposes of the career offender guideline, U.S.S.G. § 4B1.1.[31] In *United States v. Norman*, 935 F.3d 232, 239 (4ᵗʰ Cir. 2019), the Fourth Circuit held that federal drug conspiracy offenses under § 846 categorically are not controlled substance offenses under § 4B1.2(b). Thus, Mr. Wise indisputably is not a career offender.

Alternatively, Mr. Wise is not a career offender because his prior convictions for attempted distribution are not controlled substance offenses under U.S.S.G. § 4B1.2(b). The § 4B1.2(b) "controlled substance offense" definition only includes completed offenses—not *inchoate* offenses like attempt. Even though the § 4B1.2 commentary, Application Note 1, lists "attempts," this commentary is invalid because

---

[31] A "controlled substance offense" under U.S.S.G. § 4B1.1 is defined by U.S.S.G. § 4B1.2(b).

it conflicts with the text of § 4B1.2(b), which strictly limits the "controlled substance" offense" definition to *completed* offenses.

Indeed, the D.C. Circuit recently ruled as such in *United States v. Winstead*, 890 F.3d 1082, 1090-92 (D.C. 2018), and held that an attempt offense can never qualify as a § 4B1.2(b) "controlled substance offense." The en banc Sixth Circuit held the same in *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc). Judge Hazel agreed with *Winstead* and *Havis* in *United States v. Faison*, 2020 WL 815699 (D. Md. Feb. 18, 2020); *see also United States v. Bond*, 418 F. Supp.3d 121 (S.D.W.V. 2019) (relying on *Winstead* and *Havis* to hold that an attempt is not a § 4B1.2 "controlled substance offense"); *United States v. Carter*, 2020 WL 907884 (S.D.W.Va. Feb. 25, 2020) (same). And Judges Hollander and Grimm have come to the same conclusion in oral rulings. *See United States v. Alexander Mitchell,* No. ELH-18-0581 (D. Md. Dec. 13, 2019); *United States v. Hopkins*, No. PWG-99-0024 (D. Md. March 12, 2020). Likewise, Chief Judge Bredar in *United States v. Lisbon*, 276 F. Supp.3d 456, 458-59 (D. Md. 2017), under the rule of lenity, accepted the defendant's argument that inchoate offenses cannot qualify as § 4B1.2 (b) "controlled substances."

Although the Court ultimately imposed a sentence below the career offender range, the erroneous computation of the guidelines undeniably affected Mr. Wise's sentencing. The guidelines are "the starting point and the initial benchmark" at every sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Indeed, "[t]he post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review." *Peugh v. United*

*States*, 133 S. Ct. 2972, 2083 (2013).  Accordingly, "[f]ailing to calculate the correct Guidelines range constitutes procedural error."  *Id.*  As the Supreme Court has explained:

> Even if the sentencing judge sees a reason to vary from the Guidelines, if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence.  That a district court may ultimately sentence a given defendant outside the Guidelines range does not deprive the Guidelines of force as the framework for sentencing.  Indeed, the rule that an incorrect Guidelines calculation is procedural error ensures that they remain the starting point for every sentencing calculation in the federal system.

*Id.* (citations and internal quotation marks omitted).

In Mr. Wise's case, the "starting point" was erroneously more-than doubled. Had the guidelines been correctly calculated, he likely would have received a lower sentence.

3.  <u>A Sentencing Modification Is Supported by the § 3553(a) Factors.</u>

Under these circumstances, the requested modification of Mr. Wise's sentence is consistent with all of the sentencing factors set forth in 18 U.S.C. § 3553(a).

Mr. Wise was convicted of a low-level role in a nonviolent drug organization. His plea agreement reflects that he "facilitated" one transaction (a sale of 132.5 grams of heroin) by this organization "by soliciting [an undercover ATF agent] to enter the residence" where the drugs were located; he then "stood guard at the door and discussed selling marijuana and narcotics with the ATF UC." Dkt. No. 137, at 4-5. While Mr. Wise's offense conduct was undeniably serious, it did not involve any violence or the use of a firearm or other weapon.

Continued incarceration is not necessary to protect the community from the crimes of the defendant.  Mr. Wise's criminal history consists largely of street-level drug offense for which he received little or no jail time.  He has never served a multi-year term of incarceration prior to the sentence in this case.  He has no history of using firearms or violence in connection with drug offenses or otherwise.  He has never been the organizer or leader of any drug organization or moved large quantities of drugs.

Instead, Mr. Wise's history of street-level drug offenses is entirely consistent with his own significant, lifelong struggles with addiction.  *See* PSR ¶¶ 70-72.  While on pretrial supervision in this case, Mr. Wise was diagnosed with Severe Heroin and Cocaine Use Disorder; however, he was unable to receive the recommended intensive outpatient treatment due to his stringent release conditions.  PSR ¶ 72.  He ultimately relapsed and his bail was revoked as a result of positive tests for cocaine.  PSR ¶ 14.  Drug treatment will be an important part of Mr. Wise's supervised release.  With the appropriate treatment, which the Probation Office will undoubtedly facilitate, he does not present a continuing danger to the community.

In addition, at almost 60, Mr. Wise's likelihood of recidivism is significantly lowered.[32]   He has a release plan in place that includes a stable residence.

---

[32] *See, e.g.*, U.S. Sentencing Commission, Recidivism Among Federal Drug Trafficking Offenders, available at https://www.ussc.gov/sites/default /files/pdf/research-and-publications/research-publications/2017/20170221_ Recidivism-Drugs.pdf, at 3 (finding that recidivism among federal drug trafficking defendants is closely correlated with age at release, with defendants 60 and over having the lowest recidivism rate of 16.5%, compared to 65% among offenders 21 and under).

Undersigned counsel has verified that Mr. Wise has a place to stay, including his own bedroom, in the home of his nephew, James Lee (the son of Mr. Wise's sister).  Mr. Lee works for Harbor Hospital in Baltimore as supervisor of the Environmental Protection Services (janitorial) department.  Mr. Lee confirmed that he is happy to open his home to his uncle, even if Mr. Wise is required to remain in the residence on long-term home confinement.

In this case, like those cited above, *infra* at 16-18, a modification of the sentence would not diminish the seriousness of the offense, nor would it place the public in any danger.  An additional term of home detention as a condition of supervised release will adequately protect the community and ensure that Mr. Wise does not reoffend. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Mr. Wise, whose ability to engage in basic self-protective measures is restricted—warrant relief.  Mr. Wise has already served nearly a year in the Bureau of Prisons.  That time, together with an additional lengthy period of home detention, is "sufficient, but not greater than necessary" to satisfy the goals of sentencing under § 3553(a).

## CONCLUSION

The novel coronavirus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to older individuals with underlying illnesses. Given Mr. Wise's age and multitude of serious health issues, he is exceptionally vulnerable to contracting the deadly disease, which constitutes "extraordinary and compelling reasons" to grant his motion for compassionate release. Mr. Wise respectfully requests that the Court modify his sentence to time served plus five years of

supervised release, with any portion the Court deems appropriate to be served on home confinement.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

   /s/
Elizabeth G. Oyer
Senior Litigation Counsel
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: liz_oyer@fd.org